Filed 8/31/21  In re Alyssa S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re ALYSSA S., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROSA S.,<br><br>Defendant and Respondent;<br><br>ALYSSA S.,<br><br>Appellant. | F082587<br><br>(Super. Ct. No. 19CEJ300393-2)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  Jane Cardoza, Judge.

Jamie A. Moran, under appointment by the Court of Appeal, for Appellant.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Respondent.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]	Before Hill, P. J., Smith, J. and Snauffer, J.

Minor Alyssa S. appeals from an order of the juvenile court, entered after a combined six-, 12- and 18-month review hearing (Welf. & Inst. Code §§ 366.21, subds. (e)(1), (f)(1) & 366.22),[1] finding that Alyssa could not be safely returned to the custody of her mother Rosa S. (mother). Alyssa contends on appeal the Fresno County Department of Social Services (department) failed to prove the existence of a substantial risk of detriment if she were returned to mother's custody. Mother joins. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Detention by Law Enforcement*

On November 18, 2019, Alyssa's 13-year-old twin sister, A.S., sent an email to her teacher stating she was going to report the next morning that she and Alyssa had been sexually assaulted by their 23-year-old brother, Christian, for the past nine years. She had never reported it because she was afraid that she would get into trouble with the family. The following day, A.S. reported to school officials and law enforcement that Christian had sexual intercourse with her and made her orally copulate him since she was four years old. The last time was in early 2018 and she estimated it occurred more than 10 times throughout the years. Christian told her he would make her life difficult if she told anyone. She believed Christian was also making Alyssa and their 15-year-old sister, S.V., orally copulate him. She had wanted to disclose the sexual assault for a long time, but mother always dissuaded her by telling her she would not be able to live with her sister anymore and she should not cause trouble for her brother. She felt compelled to report the assault because Alyssa was having trouble dealing with the situation. On November 16, Alyssa ran away from home and did not return for several hours. When A.S. asked her why she ran away, Alyssa said she could not be in the same house as Christian. The following day, Alyssa said she did not want to live anymore and wanted to end her life. A.S. was very concerned about Alyssa and tried to enlist mother's help but mother told both girls not to report anything and to " 'worry about themselves.' "

---

[1] Statutory references are to the Welfare and Institutions Code.

2.

A sheriff's deputy placed a protective hold on the three sisters. Alyssa was involuntarily detained and admitted to a psychiatric facility because she expressed suicidal ideation. (§ 5150.) Her sisters were placed in foster care and Christian was arrested and booked into the county jail. The whereabouts of the girls' father were unknown and remained so throughout the proceedings.

Mother claimed it was the first time she heard A.S. was sexually assaulted and denied that Alyssa was raped. Alyssa accused Christian of raping her the year before, resulting in his incarceration. She subsequently wrote mother a letter apologizing for lying. Anytime Alyssa was in trouble she claimed Christian raped her. Mother admitted that S.V. was molested by Christian when they were children. The family participated in voluntary family maintenance services in 2008 and the children received therapy. Christian was sent to live out of state and there were no further incidents. Mother said Alyssa was recently caught with nude pictures of herself on her brother's cell phone, which Alyssa stole. Mother spoke to Alyssa about the pictures and deleted them from the phone. Mother said Alyssa was very disruptive at school and had behavioral problems. She assumed different personalities: a rich white girl, a black girl from the hood and a Mexican with a heavy Mexican accent.

Mother denied any criminal history or problems with domestic violence, mental health issues, or drug use.

S.V. said she was molested by Christian when she was eight or nine years old but denied anything happened since. She did not believe her sisters' rape allegations and believed they reported it because they were hiding their contacts on social media and did not want to get in trouble.

A.S. said she did not have a good relationship with mother and did not feel safe with Christian in the home. She confirmed inappropriate touching occurred between 2010 and 2018.

Social workers met with Alyssa at the psychiatric facility. Alyssa gave one of the social workers a note, stating she was sexually assaulted from the age of four and many times over the years. After Christian was released from jail mother allowed him to return to the family home where he sexually abused her again. She was not afraid of him but did not want to see him anymore and wanted someone to believe her. Alyssa clarified the letter of apology to mother concerned the nude pictures on the cell phone, not falsely accusing Christian. She did not want to return home but wanted to live with her best friend and her family.

Following a team decision meeting, the social workers decided that family maintenance services were not appropriate, and the girls should remain out of mother's custody because she was not protective. Although mother forced Christian to leave the family home, her focus was on the girls' behavioral problems rather than on the risk Christian posed to them.

Alyssa told a social worker A.S. was lying about the incident with her brother. She said the social worker was " 'dumb' " for believing the story and refused to be placed with A.S.

In January 2020, during a family reunification panel meeting, mother stated the night Alyssa ran away, a male picked her up in front of the house. Alyssa returned home at 4:50 a.m. wearing a white sweater that did not belong to her. She had "hickies" on her neck and a telephone number written on her arm. Mother confronted Alyssa about running away and asked her who she was with. Alyssa said she met someone at a gas station, and they "made out" but would not disclose the person's name. When mother continued to question Alyssa, she said Christian raped her. This was not the first time Alyssa made that statement. She also alleged Christian raped her in 2017 after being caught with a cell phone that contained inappropriate and nude pictures of Alyssa. Alyssa told mother the rape occurred during a birthday party for one of the grandchildren. Mother later realized that Christian could not have raped Alyssa because he was

4.

incarcerated. When mother confronted Alyssa about her allegation, Alyssa apologized for not being truthful.

Mother disclosed that Alyssa and A.S. were sexually abused at school when they were in second grade. They said the school janitor took nude pictures of them but never disclosed it to mother. She suspected they were sexually abused in other ways as well because they exhibited sexualized behavior after the incident. They received therapy and law enforcement investigated the incidents. In 2012, Christian molested S.V. Christian was about 13 years old, and S.V. was five. Christian kissed S.V. and that was the extent of the abuse. Mother reported the incident to the department. She, S.V. and Christian received services and Christian remained in the home. Christian was diagnosed with schizophrenia and bipolar disorder at the age of eight. He went to juvenile hall, group homes, was involuntarily detained, was sent to a program in Kentucky and eventually went to live with an uncle. She was not afraid to have Christian in her home after they received voluntary family maintenance services and did not believe he would sexually abuse his siblings.

Mother had difficulty believing her daughters' accusations against Christian because they had not been truthful in the past. She believed Alyssa made up the allegations to get out of trouble and A.S. " 'ran with it.' " Her daughters did not respect her because she did not discipline them. She believed she and the girls would benefit from individual and family therapy. She had a restraining order against Christian and would not allow him in her home.

A.S. and S.V. were placed together in a foster home. Alyssa was placed in a group home. She did not want to be placed with her siblings.

*Removal*

The juvenile court sustained allegations mother failed to protect the girls from sexual abuse (§ 300, subds. (b) & (d)). The department determined she qualified for a

bypass of services under section 361.5, subdivision (b)(6) but recommended reunification services for her because she was participating in services and was strongly bonded to her daughters.

At the dispositional hearing in June 2020, the juvenile court ordered mother to participate in parenting classes, and mental health and domestic violence treatment.[2] The juvenile court set a six- and 12-month review hearing for December 7, 2020 (review hearing).

*Reunification Efforts*

By the review hearing, mother completed a parenting class and a substance abuse assessment. She did not require substance abuse treatment. She was participating in individual therapy and in the child abuse intervention program. She visited the girls separately and under supervision. However, she did not believe A.S.'s allegations and did not appear to appreciate the severity of the abuse allegations and the reasons why the girls were removed.

The girls were divided in their attitudes about mother and desire to reunify. S.V. was disillusioned with mother's lack of progress and did not believe she could parent and protect her and her sisters. She did not want to reunify with or visit mother or her sisters. A.S. felt guilty for reporting the sexual abuse and was involuntarily detained multiple times while in placement. She wanted to reunify with mother but did not believe that was possible if she testified against Christian in his criminal case. She felt sad and ashamed during visits with mother because she believed mother was disappointed in her and disapproved of her. Alyssa also wanted to reunify with mother. She participated in substance abuse treatment for marijuana use but was discharged in November 2020 for not attending.

---

[2] Previously, mother was offered random drug testing at the detention hearing and consistently tested negative. Her attorney requested that she be subject to spot testing by the department, which the juvenile court approved.

6.

The department recommended the juvenile court terminate mother's services at the review hearing.

The juvenile court continued the review hearing to March 22, 2021, and combined it with an 18-month review hearing (combined hearing).

In February 2021, during a child family team meeting, the social workers discussed the issue of family therapy. The girls' therapists did not recommend it because the girls were not ready for it.

In its report for the combined hearing, the department recommended the juvenile court terminate reunification services, and set a section 366.26 hearing to establish a permanent plan of legal guardianship for S.V. and A.S. and long-term foster care for Alyssa. It reported that Alyssa ran away from her foster home in January 2021 and her whereabouts were unknown. A body attachment warrant was filed several days later and was active. Alyssa texted her social worker, asking why she could not go home and what mother was doing wrong. The department did not believe the girls could be returned to mother's custody without placing them at a risk of detriment. Although Christian was incarcerated and mother prohibited her other sons from returning home, the girls did not feel safe in mother's care.

*Combined, Contested Review Hearing*

Mother challenged the department's recommendations and a combined, contested hearing was conducted on March 23, 2021. Alyssa's attorney joined mother's attorney in contesting the recommendation. Her attorney wanted the court to continue reunification services. Alyssa was still on a runaway status but appeared by telephone at the hearing.

S.V. maintained that she did not want to reunify with mother because she was selfish and manipulative. Mother defended Christian and drove others to support her as well. She did not believe mother did enough to protect her and her sisters.

Alyssa testified she wanted to go home and felt "a hundred percent" confident she would be safe in mother's care.

A.S. testified her visits with mother were going well and she wanted to go home. The restraining order gave her peace of mind and she believed mother had set boundaries. She believed mother could keep her safe.

Mother testified she completed individual mental health therapy the week before. She learned about effective communication, recognizing feelings, and managing stress. In her parenting class, she learned about the "teen brain," and how best to communicate with teenagers and assist them in problem solving and decision making. She was still participating in the 52-week domestic violence class and attended 34 or 35 classes. She stopped attending during the shutdown and then contracted COVID-19 in June. She was unable to resume classes until she had a negative test and had tested positive four times. Had she not missed so many classes, she would have nearly completed the program.

Mother and the girls visited together until the twins started acting out and misbehaving at school. Their behavior caused friction with S.V. whose foster mother thought it best that S.V. visit separately. Separate visits were going well until S.V. became very ill and ended up in the hospital with a multi-organ infection. Asked whether she and the social worker ever discussed progressing in visits, mother stated there was a "huge lack of communication" with the social worker who told mother to focus on completing her services.

Mother believed A.S.'s sexual assault allegation and developed a safety plan for her daughters' return home. Her sons would not be allowed in her home and she would celebrate holidays and special occasions with them separately from her daughters. Christian agreed to abide by the restraining order. If he did not, she would contact law enforcement.

Social worker Quentina Johnson testified visits between mother and the girls did not go well when they were all together. The girls reported that mother's behavior was inappropriate. Only Alyssa consistently visited. Mother was not able to demonstrate her ability to parent her children as reported by the third-party supervisor, visitation monitor

and the girls themselves. Mother's visits were not progressed because the interactions were not healthy. Johnson disagreed that she and mother did not communicate well. They communicated regularly even if she was not always available to take mother's call and they spoke for hours when they did connect.

Alyssa often told Johnson that she wanted to reunify with mother. Their visits progressed in duration over time from one hour every month. They also attended church events together and spent time together at the foster mother's home. No problems were reported. Johnson considered advancing to unsupervised visitation for Alyssa but decided not to because placing Alyssa in the home with mother would put her back into the "place of trauma" and in a position where she might make decisions that were not in her best interest. Mother was able to demonstrate she could safely parent Alyssa under supervision but not without supervision given the nature of her visits with the siblings.

County counsel argued that mother had not shown she could protect her daughters from sexual abuse. She acknowledged S.V. was sexually abused and claimed she subsequently watched her daughters very closely and yet the abuse reoccurred. County counsel also argued there was not a substantial likelihood the children could be returned to mother with continued services and family maintenance was not appropriate. Mother's attorney argued mother was not provided reasonable visitation. She asked the court to return the girls to mother's custody because she no longer posed a risk of harm to them. S.V.'s attorney argued for termination of reunification services and A.S.'s attorney submitted on the department's report and recommendation. Alyssa's attorney argued she was unsafe as long as she was out of mother's care. She believed it was in Alyssa's best interest to be returned to mother's custody with family maintenance services.

The juvenile court found the department provided reasonable reunification services, mother's progress was moderate and the return of the children to her custody would create a substantial risk of detriment. The court terminated mother's reunification

services and set a section 366.26 hearing to consider a permanent plan of legal guardianship for S.V. and A.S. The court addressed Alyssa directly, stating:

> "[Y]ou need to contact your social worker and get back into placement.… It's important because the Court cannot make any orders that are different from the orders I just made unless you're in placement. And the reason for that is because the social worker needs to assess, needs to have that conversation with you about what you're doing, where you are, make sure you're in a safe place and then make a plan for you and your mother to proceed and what's the next step. And we can't do that unless you're in placement."

The juvenile court found that Alyssa was not a proper subject for adoption and ordered the department to place her in long-term foster care once she returned to its custody. The court ordered A.S. to undergo a substance abuse assessment and participate in any recommended treatment.

## DISCUSSION

*Dependency Law Regarding Detrimental Return*

"The dependency scheme is based on the law's strong preference for maintaining family relationships whenever possible. [Citations.] When a child is removed from parental custody, certain legal safeguards are applied to prevent unwarranted or arbitrary continuation of out-of-home placement. [Citations.] Until reunification services are terminated, there is a statutory presumption that a dependent child will be returned to parental custody." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 (*Yvonne W.*).) To that end, there is a statutory presumption at each review hearing that the child will be returned to parental custody. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308.) That is unless the court finds by a preponderance of the evidence that doing so would "create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) If the court finds it would be detrimental to return the child, it has the option of continuing reunification services to the 18-month review hearing. At that point, the court must either return the child to parental custody or set a hearing under section 366.26 to select a permanent plan. (*Id.*, subd. (a)(3).)

10.

"In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services. [Citations.] The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement." (*Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1400.) Yet, simply complying with the reunification plan by attending the required therapy sessions and parenting classes, and visiting the child does not guarantee return of the child. (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143.) While compliance with the plan is a pertinent consideration, it is not the sole concern for the juvenile court, nor is it determinative. (*Id.* at pp. 1139–1140.) Further, the detriment justifying continued removal need not be the same as the initial detriment. The focus of the decision whether to return the child to the parent's custody depends on the effect that action would have on the physical or emotional well-being of the child at the time of the review hearing. (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.) "While the statutory scheme is designed to assist families to 'correct the problems which caused the child to be made a dependent child of the court' [citation], its focus remains on the well-being of the child. [Citations.] ¶ [I]f returning the child will create a substantial risk of detriment to his or her physical or emotional well-being [citations], placement must continue regardless of whether that detriment mirrors the harm which had required the child's removal from parental custody." (*Id.* at p. 900.)

We review the juvenile court's finding of substantial risk of detriment for substantial evidence. (*Yvonne W.*, *supra*, 165 Cal.App.4th at pp. 1400–1401.) "In reviewing the sufficiency of the evidence on appeal, we look to the entire record to determine whether there is substantial evidence to support the findings of the juvenile court. We do not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order, and affirm the order even if there is other evidence

11.

that would support a contrary finding. [Citation.] … The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order." (*In re Cole C*. (2009) 174 Cal.App.4th 900, 915–916.)

*Substantial Evidence Supports the Juvenile Court's Detriment Finding*

Mother contends the evidence offered by the department—i.e., that she lacked insight into the problem requiring Alyssa's removal and did not internalize the parenting skills she learned—was speculative and insufficient to support a finding of detriment. She contends returning Alyssa to her custody would restore Alyssa to the department's custody and ensure she received the services she needed. Alyssa contends other evidence compelled a finding it would not be detrimental to return her to mother's custody, namely that mother substantially completed her court-ordered reunification services and created a safety plan for her as well as her own express desire to return to mother's custody. In our view, mother and Alyssa have missed the point.

It is undisputed mother technically complied with her services plan and made progress albeit moderate according to the juvenile court. She also removed Christian from her home, obtained a restraining order against him and instituted a plan to prevent any contact between him and the girls. However, S.V. and A.S. still perceived that mother harbored a desire to protect Christian. S.V. found mother manipulative and selfish in her efforts to protect him and A.S. felt guilty and ashamed for reporting him. On that basis, the court could reasonably doubt mother's resolve in protecting the girls from sexual abuse and find it would be detrimental to return Alyssa to her immediate custody.

Further, even if the juvenile court found no reason to believe that mother posed a risk of detriment to Alyssa, it could still find the immediate return of Alyssa to her custody would be detrimental. In determining the risk of detriment, the parent's ability to offer a safe environment for the minor is not the court's only consideration. Since the minor must function in that environment, the court must also consider the safety issues

12.

the minor presents. Here, Alyssa had been on a runaway status for two months and the court had no information about her mental status or willingness to submit to mother's authority. The court knew Alyssa wanted to return to mother's custody but not her motive for wanting to do so. Perhaps Alyssa considered mother more lenient than a foster parent and less likely to restrict her activities. Given her tendency to run away, there was no assurance she would not leave mother's home if mother attempted to assert parental control. Further, the court knew that when last consulted Alyssa's therapist did not believe she was ready for family therapy with mother. Consequently, Alyssa and mother had not had the opportunity to process the sexual abuse Alyssa experienced and any feelings she might have about mother's failure to protect her. Given the court's inability to make an informed decision about Alyssa's safety in mother's custody, the court had no choice but to find that it would be detrimental. Consequently, we find no error.

## DISPOSITION

The order is affirmed.